### WOODS v. BENSON HOTEL CORPORATION.
#### Civ. No. 2628.

United States District Court
D. Minnesota, Fourth Division.
Sept. 7, 1948.

William S. Kaplan, Chief, Litigation Unit, Office of Housing Expediter, of Chicago, Ill., Cecil H. Lichliter, Sp. Litigation Atty., of Washington, D. C., and Alex Dim, Chief Rent Atty., of Minneapolis, Minn. for plaintiff.

Rolf Ueland and Marcus G. Sundheim, both of Minneapolis, Minn., for defendant.

Charles S. Bellows, of Minneapolis, Minn., amicus curiae, for Minneapolis Hotel Assn.

NORDBYE, Chief Judge.

These motions may be considered together, although it does appear that some of the stipulated facts upon which plaintiff bases his motion were only entered into "for the purpose of deciding whether to grant or deny each party's motion for a preliminary injunction." In any event, the admissions in the pleadings and the stipulated facts are the admitted basis for determining whether the injunction granted upon those factual grounds should now be set aside. A recital of some of the facts and circumstances which apparently caused the Court to grant the temporary injunction of January 21, 1948, and the facts and circumstances subsequent thereto, seems necessary. The question presented is whether the 190 units in the Hotel Leamington became decontrolled as of June 30, 1947. If so, the temporary injunction should be vacated. If not, defendant's motion should be denied. If the temporary injunction is vacated, it follows that plaintiff's motion for a summary judgment should be denied.

This action was brought by the plaintiff to enjoin the defendant from charging and collecting over-ceiling rents for the use and occupancy of some 190 units in the Leamington Hotel, which is operated by the defendant. The action was brought under the Housing and Rent Act of 1947. Under Section 202(c) of that Act, "controlled housing accommodations" were defined, and the exception to control included "(1) those housing accommodations, in any establishment which is commonly known as a hotel in the community in which it is located, which are occupied by persons who are provided customary hotel services such as maid service, furnishing and laundering of linen, telephone and secretarial or desk service, use and upkeep of furniture and fixtures, and bellboy service."

Section 204(d) provides: "The Housing Expediter is authorized to issue such regulations and orders, consistent with the provisions of this title, as he may deem necessary to carry out the provisions of this section and section 202(c)."

Regulations and interpretations were thereafter issued by the Expediter. The original Regulation issued to take effect July 1, 1947, followed the language of the Act. But this Regulation was amended on August 8, 1947, and the words "such as", in referring to the customary hotel services, were changed to the word "including". And, according to Housing and Rent Act Memorandum No. 21, issued September 5, 1947, the Expediter ruled that the tenants of a hotel, under the phrase "are provided" in the Act, must receive the services enumerated therein, or be entitled to receive them without additional charge.

According to the stipulated facts entered into herein, it appears that the Hotel Leamington has always been considered and known as a hotel in the community in which it is located and is operated for both transient and permanent guests; that as of June 30, 1947, which is the date for determining whether the services were provided as required for decontrol by the Act, it contained 338 units, of which 123 were transient and 215 were permanent. The transient units are all decontrolled, and of the 215 permanent units, 25 are concededly decontrolled, leaving 190 permanent units, which are the units here involved. Each of the 190 units consisted of one or more rooms, and in addition a kitchen and bath. They were occupied by permanent or resident guests, as distinguished from transient guests. Regarding the services specified in the Act, all units had bellboy service, telephone and secretarial or desk service; 66 had complete furniture service and 115 partial furniture service; 31 had the furnishing and laundering of linen; and 7 had maid service. Each of these services, though not used by a particular tenant, was available to him. In addition to these services, there were available to all tenants the customary hotel services, such as elevator service, baggage check room service, dining room service, meal service in rooms, cleaning and window washing service, taxi calling service, and maintenance of public parlors and washrooms. For the additional services and for the partial furniture service, there was no charge other than the basic rental charge for the unit.

The stipulation recites: "3. With respect to the 190 units mentioned in the complaint whose tenants on June 30, 1947, were actually using none or less than all of regular furniture service, linen service and maid service, each of these services then was and since has been available to the tenant in the sense that he might have requested and received it within a reasonable time if he agreed to pay the additional rental charge for it, but none of them was or has been available to the tenant if he would not agree to pay the additional charge for it."

The material portions of Paragraph 15 of defendant's counterclaim are admitted in plaintiff's reply. This paragraph reads as follows: "On and ever since June 30, 1947, all of the specified services have been available to all occupants of all units in the hotel in all of the following senses: (a) defendant has maintained the hotel's service departments and a reserve of furniture and equipment in storage so that as high a percentage of occupants as experience showed might ever desire all of the services could request and promptly receive them; (b) any occupant upon first taking possession of his unit might have requested

and received all of the services; (c) any reasonable percentage of occupants who on June 30, 1947, were receiving less than all of the services might then have requested and received all of them without paying more than the then allowable rents; and (d) all of such occupants if they so desired could have received all of the services within a reasonable time."

It was on this record, the Regulations, and the interpretations of the Act, that the Court granted a temporary injunction restraining the defendant from collecting rents higher than the maximum set by the housing authority. An appeal was taken to the United States Court of Appeals, and on June 11, 1948, that court affirmed the trial court. Benson Hotel Corporation v. Woods, 8 Cir., 168 F.2d 694. The defendant contended upon the appeal that, 168 F.2d at page 696: "(1) the Act itself decontrolled the units; (2) the Regulation was invalid because inconsistent with and not authorized by the Act; (3) the interpretations and order by the office of the Housing Expediter were not valid because arbitrary and inconsistent with both the Act and the Regulation; (4) that since the granting of the injunction pendente lite in this case, both the Act and the Regulation promulgated thereunder have been amended in such manner as to indicate clearly what the law was at the time of the granting of the injunction, and that these amendments indicate that it is not necessary for decontrol of hotel units that all of the specified services be provided, and that services are provided if they are available."

Without expressing any opinion as to the merits of the case, the Court merely held that the granting of the injunction was within the discretion of the trial court and that that discretion had not been exceeded in the granting of the temporary injunction, stating, 168 F.2d at page 697:

" * * * Even though we should assume that the appellant's contentions are correct, a question upon which we express no opinion, it would not follow that the court abused its discretion in granting the preliminary injunction appealed from. There is sound reason for the rule that the decision of either the trial or appellate court in granting or denying the tempo-rary injunction does not constitute the law of the case and will not stop the parties nor the court as to the merits of the case. As said in Walker Memorial Baptist Church v. Saunders, supra (285 N.Y. 462, 35 N.E.2d [42] 47):

" 'The plaintiff urges upon this appeal that the law of the case was conclusively determined by the order of the Appellate Division affirming the granting of the temporary injunction since that order, it is argued, constitutes an adjudication that the complaint sets forth a good cause of action. A complete answer to this contention is that the granting of a temporary injunction serves only to hold the matter in statu quo until opportunity is afforded to decide upon the merits. The granting or refusal of a temporary injunction does not constitute the law of the case or an adjudication on the merits, and the issues must be tried to the same extent as though no temporary injunction had been applied for.' "

And as to defendant's position that the law and regulations had been amended since the temporary injunction was granted, the court observed, 168 F.2d at page 698:

" * * * When the case is tried on its merits it must be determined in accordance with the law and regulations then in effect. It is argued by appellant that both the Act and the Regulations have been amended and that as so amended the plaintiff is not entitled to a permanent injunction. If appellant is correct in this contention he will not be precluded from so contending by reason of the decision of the trial court in granting the temporary injunction, nor by our decision in affirming such action."

Since the granting of the temporary injunction herein, Congress amended the 1947 Act by the Housing and Rent Act of 1948, 50 U.S.C.A.Appendix, § 1881 et seq., which took effect April 1, 1948. The new law retained unchanged the original definitions of decontrolled hotel units. The views of the Committee of Conference, which led to the final amendatory 1948 Act, are found in H. R. Report No. 1611, 80th Congress, 2nd Session, March 24, 1948, and in the explanatory statement of the Managers on the Part of the House appears the following (p. 9): "Under paragraph

(1) of subsection 202(c) of the 1947 act, hotels are decontrolled, generally speaking. The administration of the provisions of this paragraph has not been satisfactory and has resulted in a great deal of confusion. One of the difficulties grew out of the issuance by the Housing Expediter of a regulation which substituted the word 'including' for the words 'such as' used in the act, in referring to the several types of services used for the purpose of determining what constitutes 'customary hotel services.' The effect of this regulation, of course, was to require that all the services specified in the law must be present before the housing accommodations were decontrolled. That was not the intent of Congress when the 1947 act was passed. Not necessarily all the types of services named in the act as examples need be provided in all cases, as long as enough are provided to constitute customary hotel services usually supplied in establishments commonly known as hotels in the community where they are located. Another difficulty was that some of the regional offices of the Housing Expediter had construed the word 'provide' to require that the services must actually be received by the tenant. It would seem obvious that when Congress used the language 'which are occupied by persons who are provided customary hotel services, etc.', it had in mind that these services must only be made available, whether or not accepted. The Senate Bill inserted language seeking to make the intent of Congress clear. The managers on the part of the House were of the opinion that notwithstanding any language in the House report the specific changes in language suggested by the Senate were not necessary to carry out that intent. Accordingly the conference agreement makes no change in the language of the present law."

After the passage of the 1948 Act, the Housing Expediter apparently recognized that his prior regulations and interpretations were erroneous and that he had misconstrued the intent of Congress, and promulgated an amendment to Section 1 of the Rent Regulations for Controlled Rooms in Rooming Houses and other Establishments, as follows:

"This regulation does not apply to the following:

"(1) Rooms in hotels, motor courts, trailers and trailer spaces, tourist homes, and other establishments.

"(a) Rooms in a hotel (see definition of hotel in section 1) which on June 30, 1947, were occupied by persons to whom were provided customary hotel services such as maid service, furnishing and laundering of linen, telephone and secretarial or desk service, use and upkeep of furniture and fixtures, and bellboy services (not necessarily all the types of services named need be provided in all cases, as long as enough are provided to constitute customary hotel services usually supplied in establishments commonly known as hotels in the community where they are located)."

On April 19, 1948, Memorandum No. 44 was issued by the Office of the Housing Expediter, which stated, in part: "Although the provisions relating to the decontrol of accommodations in hotels in the 1947 Act have not been changed by the Housing and Rent Act of 1948, Congress has clearly indicated in its legislative history that all 5 services named in the Act need not be provided for the accommodations to be decontrolled."

The following also appears in this memorandum:

"In the conference report, the managers on the part of the House of Representatives state:

" 'Not necessarily all the types of services named in the Act as examples need be provided in all cases as long as enough are provided to constitute customary hotel services usually supplied in establishments commonly known as hotels in the community where they are located.' "

And further:

"The legislative history of the Housing and Rent Act of 1948 also makes it very clear that Congress does not intend that the customary hotel services must have been actually provided to the guest on June 30, 1947. It is sufficient for the purposes of decontrol if the services were available to the guest with or without extra cost. If, therefore, the hotel on June 30, 1947, pro-

vided linen service at an additional cost the fact that the guest on June 30, 1947, did not accept this service does not defeat decontrol.

"Similarly, a unit in a hotel on June 30, 1947, which was unfurnished would remain under control unless furniture was available to the tenant with or without additional cost."

The latest interpretation of the Expediter is to be found in a memorandum which was issued on June 29, 1948. There, the Expediter makes the specific reservation that

"This interpretation is not intended to apply to the decontrol status of housing accommodations in hotels under the Housing and Rent Act of 1947 prior to its amendment by the Housing and Rent Act of 1948, which latter Act became effective April 1, 1948."

This interpretation also contains the following:

"5. Meaning of the word 'provided' as used in the Act and Regulations. The legislative history of the Act also makes it clear that Congress did not intend that the customary services be actually received by the occupant on June 30, 1947, in order to make such units eligible for decontrol. An accommodation is eligible for decontrol if on such date the customary services were made available to the occupant with or without, extra charge.

"To have been available on June 30, 1947, the services must have been actually present or maintained by the hotel for the immediate use of the occupant or, in other words, 'available' means on hand for use at tenants' option."

We are confronted, therefore, with a situation where it is now recognized by the Expediter that his interpretation prior to April 1, 1948, was in error and that he misconstrued the intent of the legislative act as drafted by Congress. In 1948 when Congress amended the 1947 Act, it made no change in the provisions of the Act which are controlling herein. It should be observed that the June 30, 1947, date is retained by the Expediter as the crucial date when control or decontrol should be determined, and moreover, it appears that the Expediter has conceded that the word

"provided" as used in the Act—and the Act in that regard remains the same as in 1947—means "available * * * with, or without, extra charge." However, the Expediter contends that the interpretation which he has now promulgated is not applicable to decontrol the status of housing accommodations in hotels under the Housing and Rent Act of 1947 prior to the 1948 amendment, and second, that the word "available" in so far as the furnishing of linen, furniture and maid service is concerned, means that the hotel at all times must have had on hand sufficient linen, furniture and maid service to have supplied all tenants with these services forthwith at their option.

All of the regulations and interpretations promulgated by the Expediter with reference to the services made available by a hotel to its guests in order to be eligible for decontrol are retroactive in that they refer back to June 30, 1947, the test date for decontrol. This is recognized by the Expediter in that, although from July 1, 1947, to August 8, 1947, the Regulations defined decontrolled hotel units in the same way as the Act, notwithstanding he considers the defendant bound by the first Regulation promulgated by him on August 8, 1947, when he enlarged the term "such as" in the Act to "including". And the position of the Expediter is that, under the identical Act of Congress, a hotel using the same test date for availability of services, to wit, June 30, 1947, could be controlled from July 1, 1947, to April 1, 1948, but decontrolled thereafter solely because the interpretation now recognized by the Expediter differs from that promulgated by him in the year 1947.

The Court's duty is to determine the meaning of the language used by Congress in the 1947 Act, as amended. Obviously, the language to be construed must mean the same today as it did when the Act was passed, and must have meant the same when the Act was passed as it does today. If a construction and interpretation is sound as of today, it must also have been sound as of the date when the legislation was passed. In considering this particular question, we are not confronted with any problem as to the construction of any regulation

as such, or as to the weight to be attached to the Expediter's interpretation of any regulation. We are only concerned with what Congress meant when it used the term "available" as it appears in the Act. The Expediter has now made it clear that if, as of June 30, 1947, customary hotel services, such as maid service, furnishing and laundering of linen, telephone and secretarial or desk service, use and upkeep of furniture and fixtures, and bellboy services, were made available, with or without additional charge—not necessarily all the types of service must be provided in all cases as long as enough are provided to constitute customary hotel service usually supplied in establishments commonly known as hotels in the community in which they are located —then such hotel is decontrolled.

█ It is not necessary now to determine whether the language used in the 1947 Act of Congress was in any way ambiguous, as the Expediter contends, and that therefore he was within his prerogative in promulgating the Regulations and interpretations in 1947 which appeared to him to be necessary in carrying out the provisions of the Act. Suffice it to say, that the Expediter has now recognized that there is no ambiguity at this time, that the earlier Regulations and interpretations were erroneous, and that his latest pronouncements are to control. In his Memorandum 44, issued April 19, 1948, he refers to the "change in our position" and explains it by reason of the views of the Congressional Committee, but he does not indicate any date for decontrol other than June 30, 1947, nor does he assume to suggest that the interpretation is not retroactive. By the fiat which he assumed to issue on June 29, 1948, that the interpretation will not apply to the decontrolled status of housing accommodations in hotels under the Housing and Rent Act prior to its amendment effective April 1, 1948, for the first time he endeavors to say that the same, identical law meant one thing in 1947, up to April 1, 1948, and another thing thereafter. This he had no authority to decree. He has no authority to say that Congress meant one thing in 1947 and another thing in 1948.

The matter is not determined, as plaintiff suggests, by urging that the interpretations given in 1948 are in the prospective only. Undoubtedly, there may be situations where regulations and interpretations which are promulgated must not be considered to operate retroactively, but all of these interpretations necessarily do operate retroactively. They assume to establish the test of decontrol as of June 30, 1947. They assume to correct an invalid administrative construction of a statute.

█ The decision of the Court in granting the temporary injunction does not constitute the law of the case. This was made clear in the decision of the Court of Appeals, and that court took pains to point out that when the case was tried on its merits "it must be determined in accordance with the law and regulations then in effect." [168 F.2d 698] The submission of this motion to dissolve the temporary injunction and plaintiff's motion for summary judgment in which he seeks a permanent injunction from July 1, 1947, to and including March 31, 1948, and the recovery of any amounts of rent in excess of the maximum legal rent established and prescribed during that period, present to the Court the same question as would arise if the case were submitted on its merits.

█ Some contention is made that the stipulation of facts merely recites that, with respect to the 190 units whose tenants were actually using none or less than all of the regular furniture service, linen service, and maid service on June 30, 1947, each of these services on said date then was and since has been available to the tenant in the sense that he might have requested and received it within a reasonable time if he agreed to pay the additional rental charge therefor. Plaintiff contends that, to have been available on June 30, 1947, the services must have been actually present or maintained by the hotel for the immediate use of the occupant, or in other words "available" means continuously on hand for use at the tenant's option. There is no basis for the Expediter

to assume that, in order to have furniture available for the tenant, the hotel company must have had on hand and in its possession one hundred per cent of all the furniture that the 190 units might at any moment require. Such a construction seems highly impractical and unreasonable. Presumably, before June 30, 1947, certain tenants had already indicated that they preferred to furnish their own apartments and to furnish their own linen. This seems obvious from the stipulated facts where it appears that, as of that date, there were certain units that were only partially furnished. To suggest, therefore, that the hotel company, notwithstanding the tenants' preference, must have in storage and on hand sufficient furniture for immediate use for each and every unfurnished unit, places an unreasonable construction on language which will not warrant such an interpretation. Most permanent tenants who are renting on a month to month basis would not want to change their renting arrangement from a partially furnished to a completely furnished unit in the middle of the month, and would assume that reasonable notice would have to be given to the hotel company so as to enable it to make available to the tenants such additional, and to some extent presumably the type of, furniture the tenant might desire. Under the Expediter's interpretation, a hotel company would have to have sufficient standby maids so that if a tenant might indicate on any day or hour that he desired maid service the hotel company would have to immediately provide such service. The onerous expense and the impossibility that any hotel company would be able to fulfill such standards of availability seem apparent. Under the stipulation and pleadings, it would appear that the hotel company was ready, willing, and able to make these services available to the tenants at their option. But different conditions would suggest some leeway as to the exact time and exact circumstances under which such services might be made available. There is no suggestion that a reasonable time is not making available such services to the tenants with sufficient promptness to satisfy the purposes of the Act and the needs and demands of the tenants. It is not contended that any tenants have demanded any of the services and have not obtained them with the promptness that the situation seemed to require.

Congress recognized the item of the increased cost of hotel services as one of the factors which prompted the legislation providing for decontrol of hotels under the circumstances outlined in the Act. The cost will not be lessened or mitigated by defendant's furnishing the services within a reasonable time instead of having them "on hand" as plaintiff assumes to require. Assume that there are 50 units without services and a hotel company has "on hand" services for 25 units. Presumably, under the plaintiff's construction, 25 units should be decontrolled. But, under such circumstances, there would be no practical or workable method of determining which units are decontrolled. The example tends to illustrate the unworkability of plaintiff's administrative theorizing. A practical, workable, and eminently fair construction of the Act is fulfilled by the admitted facts herein.

It would seem, therefore, that on this record the Court must find that the 190 units in question were decontrolled as of June 30, 1947, and that by reason of the premises the plaintiff has not sustained his right to a continuation of the injunction which has heretofore been issued. It follows that the order granting the injunction as of January 21, 1948, must be, and is, in all things vacated and dissolved, and that plaintiff's motion for a summary judgment be, and the same hereby is, in all things denied.

An exception is allowed to the plaintiff.