**WOODS, Housing Expediter, v. BENSON HOTEL CORPORATION.**

No. 13894.

United States Court of Appeals
Eighth Circuit.

Nov. 11, 1949.

Hugo V. Prucha, Assistant General Counsel, Office of the Housing Expediter, Washington, D. C. (Ed. Dupree, General Counsel, and Cecil H. Lichliter, Special Litigation Attorney, Office of the Housing Expediter, Washington, D. C., were with him on the brief) for appellant.

Rolf Ueland, Minneapolis, Minn. (Marcus G. Sundheim, Minneapolis, Minn., was with him on the brief), for appellee.

Before GARDNER, Chief Judge, and WOODROUGH and COLLET, Circuit Judges.

COLLET, Circuit Judge.

This appeal involves the question of whether the Hotel Leamington was decontrolled by the Housing and Rent Act of 1947, 50 U.S.C.A.Appendix, § 1881 et seq., which became effective July 1, 1947. This Act was subsequently amended, effective April 1, 1948, but no change was made in the provisions which are controlling here.

On January 21, 1948, upon a showing made in support of an application for a preliminary injunction, such an injunction was issued enjoining the appellee-defendant from charging greater rentals in the Hotel Leamington than the ceiling prices theretofore fixed for that dwelling accommodation called for. There was an appeal from that order. This court in Benson Hotel Corporation v. Woods, 168 F.2d 694, affirmed the issuance of the temporary injunction upon the ground that at that stage of the proceedings, under the facts disclosed by the record, the issuance of the injunction was discretionary with the trial court and would not be disturbed. Our opinion expressly reserved any decision on the merits. Thereafter the defendant filed a motion for an order dissolving the preliminary injunction, contending that the hotel had been decontrolled by the Act of July 1, 1947.[1] The plaintiff also filed a motion for summary judgment to require defendant to refund excessive rentals collected from July 1, 1947, to and including March 31, 1948, upon the premise that the housing accommodation was under control from July 1, 1947, until April 1, 1948. Upon a consideration of these motions, the trial court dissolved the preliminary injunction and denied plaintiff's motion for summary judgment by an order entered on September 7, 1948. See D.C., 81 F.Supp. 46. The cause was heard on the merits and upon such hearing the action was dismissed by an order made November 16, 1948. From the judgment of dismissal, this appeal is prosecuted. The facts are fully set out in the memorandum opinion accompanying the order of the trial court, reported in 81 F.Supp. 46, and need not be repeated at length.

The material facts found by the trial court are that the Hotel Leamington is a ten-story building, occupying a city block in Minneapolis, Minnesota; that it has always been commonly known in that community as a hotel; that it has always been operated for both transient and resident, or permanent, guests. It consists of a total of 338 units, all of which, except 190, had concededly been decontrolled on or before July 1, 1947. These 190 units which are alone involved in this action each consist of a room or group of rooms occupied by a single guest, family, or group. Each of them comprises a kitchen and bath and one or more additional rooms. In these 190 units all of the services which are ordinari-

1. The pertinent provision of the Act is Sec. 1892(c) (1), Title 50 U.S.C.A.Appendix:

"(c) The term 'controlled housing accommodations' means housing accommodations in any defense-rental area, except that it does not include—

"(1) those housing accommodations, in any establishment which is common-

ly known as a hotel in the community in which it is located, which are occupied by persons who are provided customary hotel services such as maid service, furnishing and laundering of linen, telephone and secretarial or desk service, use and upkeep of furniture and fixtures, and bellboy service; * * *."

ly or customarily provided by hotels in the community in which the Hotel Leamington was situated were either furnished or were available to the occupants upon demand within a reasonable time. On June 30, 1947, seven of these 190 units received the regular maid service; 31 of them were furnished with linens and laundry service; 190 of them received telephone and secretarial or desk service; 66 of them were completely furnished with furniture and fixtures; 115 of them were partially furnished, i. e., with cooking stoves, electric refrigerators, and window curtains; all received bellboy service; some received both furniture and fixtures and linen service; some were fully furnished and received maid service; and still others were both furnished and received maid service and also linen service. The significant fact involved on this appeal is that none of the units were being furnished all of the services mentioned in the Act of July 1, 1947; but all of such services were, as heretofore stated, available to each and every one of the occupants of these 190 units upon demand within a reasonable time.

The findings of the trial court of the foregoing facts are presumptively correct and should not be set aside on appeal unless clearly erroneous. And due regard must be given to the opportunity of the trial court to judge the credibility of the witnesses. Woods v. Western Holding Corporation, 8 Cir., 173 F.2d 655, 656. The record contains adequate evidentiary support for the trial court's findings. In fact the findings of fact are not seriously challenged.

The Housing Expediter contends that the trial court was in error in dissolving the preliminary injunction and dismissing the action on the merits because during the period from July 1, 1947, until April 1, 1948, the original regulations, as amended August 8, 1947,[2] and the Expeditor's interpretations of the 1947 Act were still in effect; under that regulation the hotel must have furnished and the tenants actually utilized all of the services named in the Act;[3] and since the hotel did not do so, it was, according to that regulation, under control until the regulation was changed April 1, 1948. He argues that the regulation was not an unreasonable interpretation of the Act and should be given effect during the time of its existence as an administrative construction of the Act. By his amended regulation of April 1, 1948, and the Housing and Rent Memorandum No. 44, April 19, 1948, the Expediter changed his previous construction of the Act of July 1, 1947. Under the regulation of April 1, 1948, and the interpretation thereof, he construes the Act of July 1,

---

2. The applicable parts of the regulation as amended, 12 F.R. 5457, effective August 8, 1947 are:

"'Hotel' means any establishment which is commonly known as a hotel in the community in which it is located and which provides customary hotel services including maid service, furnishing and laundering of linen, telephone and secretarial or desk service, use and upkeep of furniture and fixtures, and bellboy service.

"Sec. 1(b) This regulation does not apply to the following:

"(8) Rooms in hotels, motor courts, tourists homes, and other establishments.

"(i) Rooms in a 'hotel' (See definition of 'hotel' in section 1) which are occupied by persons who are provided customary hotel services including maid service, furnishing and laundering of linen, telephone and secretarial or desk service, use and upkeep of furniture and fixtures and bellboy service; * * *."

3. On September 5, 1947, the Housing Expediter issued Housing and Rent Memorandum No. 21, the applicable part of which is:

"Decontrol of Housing Accommodations or Rooms in a Hotel

"In order for housing accommodations or rooms to be decontrolled, they must be located in an establishment customarily known as a hotel in the community in which it is located, the establishment must provide all of the services enumerated in the definition of hotel, and the individual accommodations or rooms must receive all of the services enumerated in the definition of hotel.

"The test date for determining decontrol is June 30, 1947, and the exemption becomes effective only for those accommodations eligible for decontrol on that date. * * * *"

1947, to mean that it does not require that all of the services mentioned in that Act be provided in order that the hotel be decontrolled, but that it is sufficient for decontrol in that regard if enough of the services of the nature of those described in the Act are provided to constitute customary services usually supplied in establishments commonly known as hotels in the community.[4] He further concedes by the amendment of his regulations made on April 1, 1948, and his interpretations thereof, that it was not the intention of Congress by the Act of July 1, 1947, to require that all of the services mentioned in the Act must actually have been utilized in order to have been "provided", but that it was sufficient under the Act if those services were "available" to the guest with or without extra cost.[5]

■ The Expediter argues that his original regulations and interpretations should be given effect because administrative regulations and interpretations of an Act of Congress should be given great weight. We readily concede that the Housing Expediter's interpretation of the Act of Congress should be given great weight.

But it must be as readily conceded that the construction of and interpretation of a statute as applied to justiciable controversies is a judicial function; and when administrative interpretation and judicial construction conflict, the latter must prevail. Woods v. Petchell, 8 Cir., 175 F.2d 202, 206.

■ The intent of an Act of Congress may be gathered not only from the language of the Act but also from contemporaneous legislative history. In Woods v. Western Holding Corporation, 8 Cir., 173 F.2d 655, 660, the intent of this same Act was under consideration. We there referred to the legislative history of the Act as reflected by the Committee Report, 173 F.2d loc. cit. 660:

"The Legislative history disclosed by the Congressional Committee report in connection with the 1948 Act reflects the congressional interpretation of the Act of 1947. When the 1948 Act was under consideration, Senator Cain, reporting for the Committee on Banking and Commerce, said, among other things: 'One of the difficulties grew out of the issuance by the Housing Expediter of a regulation which substituted

4. The pertinent part of this regulation (13 F.R. 1873) is as follows:

"(2) Decontrolled housing to which this regulation does not apply.—This regulation does not apply to the following:

"(i) Rooms in hotels, motor courts, trailers and trailer spaces, tourist homes, and other establishments.—(a) Rooms in a hotel (see definition of hotel in section 1) which on June 30, 1947, were occupied by persons to whom were provided customary hotel services such as maid service, furnishing and laundering of linen, telephone and secretarial or desk service, use and upkeep of furniture and fixtures, and bellboy services (not necessarily all the types of services named need be provided in all cases, as long as enough are provided to constitute customary hotel services usually supplied in establishments commonly known as hotels in the community where they are located)."

5. It was said in the Memorandum, among other things (No. 44):

"Although the provisions relating to the decontrol of accommodations in hotels in the 1947 Act have not been changed by the Housing and Rent Act of

1948, Congress has clearly indicated in its legislative history that all 5 services named in the Act need not be provided for the accommodations to be decontrolled. In the conference report, the managers on the part of the House of Representatives state: 'Not necessarily all the types of services named in the Act as examples need be provided in all cases as long as enough are provided to constitute customary hotel services usually supplied in establishments commonly known as hotels in the community where they are located.'

*       *       *       *       *       *

"The legislative history of the Housing and Rent Act of 1948 also makes it very clear that Congress does not intend that the customary hotel services must have been actually provided to the guest on June 30, 1947. It is sufficient for the purposes of decontrol if the services were available to the guest with or without extra cost. If, therefore, the hotel on June 30, 1947, provided linen service at an additional cost the fact that the guest on June 30, 1947, did not accept this service does not defeat decontrol.  *  *  *"

the word "including" for the words "such as" used in the Act, in referring to the several types of services used for the purpose of determining what constitutes "customary hotel services." The effect of this regulation, of course, was to require that all the services specified in the law must be present before the housing accommodations were decontrolled. It is submitted this was not the intent of Congress when the 1947 Act was passed. For example, it was not intended that the failure to provide telephone service, or a bellboy, would necessarily prevent an establishment from being decontrolled. It may be fairly said that the intent of Congress was that it was only necessary to see whether the services of the general character specified were available and if the hotel was, in general, a "furnished service establishment," it would be decontrolled.'

"When the 1948 Act was under consideration by Congress, the Acting Housing Expediter was called before the committee considering the bill. Referring to this fact, Senator Cain, in his report, said: 'It is entirely likely that the Committee would have recommended further changes in the existing Federal rent-control law but for the fact that during the hearings on this matter, the Acting Housing Expediter agreed to change his instructions and procedures in such a manner as to carry out what the Committee feels was the intent of Congress in adopting the Housing and Rent Act of 1947.'

"Following, and apparently prompted by, the consideration of the 1948 Housing and Rent Act by Congress, the Housing Expediter issued his interpretation of Section 202(c), * * *."

The Expediter's Amended Regulation of April 1, 1948, and his interpretation thereof, dated April 19, 1948, followed this Committee Report. We feel justified in assuming that the Amended Regulation and its interpretation were pursuant to the agreement referred to in that Report. By them the Expediter conforms his interpretation of the Act to the construction clearly given it by the Committee Report. We

are convinced that the Act means what the Committee Report said it meant and what the Expediter now construes it to mean. It has not been changed in this respect. It therefore had the same meaning on its effective date—July 1, 1947. The contradictory construction given it by the Expediter in his Regulation of August 8, 1947, 12 F.R. 5457, was out of harmony with the statute and, hence, the regulation in that respect was a nullity. Manhattan General Equipment Company v. Commissioner, 297 U.S. 129, 134, 56 S.Ct. 397, 80 L.Ed. 528; Lynch v. Tilden Produce Co., 265 U.S. 315, 320–322, 44 S.Ct. 488, 68 L.Ed. 1034.

It is argued further that the trial court erred in dissolving the preliminary injunction and denying plaintiff's motion for summary judgment because the Act in requiring that the services be provided meant that they were to be "available" and that to be available meant that they be at hand for instant use of the tenant upon demand. Since the facts are, as heretofore noted, that some of the essential services were not used by all tenants and were available to them only upon and after reasonable notice of their desire therefor, plaintiff contends that they were not provided within the meaning of the Act or his April 19, 1948, interpretation thereof.[6]

In construing the Act of July 1, 1947, it is of importance to bear in mind the general objective of Congress at that time. It was then two years after V-J Day, and with two exceptions, rents alone were controlled by ceiling prices. And ceiling prices on rents in typically transient hotels had been removed. Hence, the Rent Control Act of 1947 in providing for the removal of controls on housing accommodations was intended to have further application than to transient hotels. In defining the types of establishments which were to be decontrolled, Congress could have either specified exactly what services had to have been furnished on a certain date in order for an establishment to be decontrolled, and provided for the application of that rigid yardstick throughout the Nation, with the resulting greater uniformity and effective-

6. Housing Rent Memorandum No. 44 heretofore quoted in footnote 5, ante.

ness of enforcement, but also with a correspondingly greater number of "hardship cases" caused by the application of such an unelastic criterion to the many and varied practices and customs existing in different geographical sections of the country and the disruption of those customs, sometimes long-existent; or it could have drafted a more flexible Act which would extend decontrol to establishments which were commonly known in their community as hotels and which furnished the hotel accommodations and services which hotels in that community usually supplied, in the manner such services were usually supplied by hotels in the community, and thereby leave the question of whether a given establishment was a hotel and furnished the usual hotel accommodations to be determined in the light of the local customs and practices in the community in which the establishment was situated. Congress obviously chose the latter course. It did not say, for example, that all five of the types of services mentioned in the Act had to be furnished in order for an establishment to be classed as a decontrolled hotel. It said that those establishments which were occupied by persons who were provided with customary hotel services, such as, maid service, furnishing and laundering of linen, telephone and secretarial or desk service, use and upkeep of furniture and fixtures, and bellboy service would qualify for decontrol. In using the foregoing language it did not actually specify that to qualify as a hotel the establishment must furnish the services customarily furnished by establishments commonly known as hotels in the community in the manner those "commonly known" hotels furnished them. But such intent is readily gleaned from the purpose of the Act, its context, and from the explanation of the agreement reached by the Conference Committee of the House and Senate,[7] wherein it was said: "Not necessarily all the types of services named in the act as examples need be provided in all cases, as long as enough are provided to constitute customary hotel services usually supplied in establishments commonly known as hotels in the community where they are located." Thus, in addition to the reason already pointed out, the Expediter's regulation of August, 1947, requiring that an establishment furnish all of the five types of services was not consistent with the intent of the Act that the criterion should be the local practice and custom. Nor is it consistent with the intent of Congress that local practices should constitute the criterion to apply, in determining what conduct or practice shall constitute "providing" such services, the

7. H.R. Report No. 1611, 80th Congress, 2nd Session, March 24, 1948:

"Under paragraph (1) of subsection 202(c) of the 1947 act, hotels are decontrolled generally speaking. The administration of the provisions of this paragraph has not been satisfactory and has resulted in a great deal of confusion. One of the difficulties grew out of the issuance by the Housing Expediter of a regulation which substituted the word 'including' for the words 'such as' used in the act, in referring to the several types of services used for the purpose of determining what constitutes 'customary hotel services.' The effect of this regulation, of course, was to require that all the services specified in the law must be present before the housing accommodations were decontrolled. That was not the intent of Congress when the 1947 act was passed. Not necessarily all the types of services named in the act as examples need be provided in all cases, as long as enough are provided to constitute customary hotel services usually supplied in establishments commonly known as hotels in the community where they are located. Another difficulty was that some of the regional offices of the Housing Expediter had construed the word 'provide' to require that the services must actually be received by the tenant. It would seem obvious that when Congress used the language 'which are occupied by persons who are provided customary hotel services, etc.', it had in mind that these services must only be made available, whether or not accepted. The Senate Bill inserted language seeking to make the intent of Congress clear. The managers on the part of the House were of the opinion that notwithstanding any language in the House report the specific changes in language suggested by the Senate were not necessary to carry out that intent. Accordingly the conference agreement makes no change in the language of the present law."

conduct or practice of establishments located in other communities or the conduct or practice of a different type of establishment. The criterion for application is —did the Leamington furnish, or "provide", or make "available", the services of the type described in the Act customarily furnished by other similar establishments "known in that community as hotels" [8] in the manner which those other establishments furnished them?

Obviously, in answering the foregoing question, it will not do to apply the customs and practices of a typically transient hotel because, as heretofore pointed out, as noted in Woods v. Western Holding Corp., supra, and as recognized by the Expediter in his interpretation of the Act, other types of hotels than transient hotels were included in the statutory definition of "Hotels" in the Act, and the 190 units of the Leamington do not constitute a transient hotel. We quoted the following excerpt from the Expediter's interpretations in Woods v. Western Holding Corporation, supra [173 F.2d 660]: "The word 'hotel' is interpreted to include all types of hotels, such as transient hotels, residential hotels, apartment hotels, or family hotels."

The complaint was filed November 12, 1947; the stipulation of facts was dated December 8, 1947; and the preliminary injunction was issued January 21, 1948; all before the Expediter changed his Regulation on April 1, 1948. It was plaintiff's theory up to that time that the Leamington was subject to control under the 1947 Act unless it actually furnished all of the five types of services described in that Act. The defendant's motion to dissolve the preliminary injunction and plaintiff's motion for summary judgment were both filed after the Expediter had amended his regulation on April 1, 1948, and had interpreted the Act to mean that only as many of the types of services mentioned in the Act as other hotels of the same type in the community furnished need be "provided" to qualify for decontrol, and that to provide

meant to make available instead of being actually used. From that time on, the case was tried by plaintiff on the theory (with regard to the construction of the term "provided") that provided meant to make available and to make available meant to make immediately available or to have all furniture, equipment, and manpower on hand, ready to give all of the services customarily furnished by hotels in that community. The evidence submitted on the motion to dissolve the preliminary injunction, the motion for summary judgment, and at the final hearing on the merits was all directed to that issue. Consequently, there is no evidence in this record and, of course, no finding by the trial court on the question of whether the method by which the Leamington made the vital services available to its tenants was similar to the method other establishments in that community, commonly known as hotels of the Leamington type, customarily furnished those services to their tenants. To provide or make available hotel services of the customary character involves different practices in different localities. And the customary manner of making available different hotel services in apartment hotels differs from the customary manner those services are made available in transient hotels. Even the practices of the latter differ in different localities. We cannot say from this record, therefore, whether the Leamington provided the services in the manner which the Act contemplates. But we can determine and do hold upon this record that the theory upon which plaintiff sought the injunction and upon which this appeal is predicated, i. e., that, regardless of local custom and practice, or the type of hotel involved, the vital services had to be on hand immediately available in order to meet the statutory requirement, is based upon an erroneous construction of the Act.

The judgment of the trial court rejecting that construction of the Act and dismissing the action upon the evidence submitted was correct and is affirmed.

8. It was agreed that the Leamington was known in the community as a hotel.